NAYLOR *v.* SHELTON.

Opinion delivered January 15, 1912.

1. FRAUDS, STATUTE OF—AGREEMENT TO WILL LANDS.—Where a person for a valuable consideration agreed to will a certain tract of land to his daughter, and executed and delivered a will accordingly, the contract is taken without the statute of frauds. (Page 38.)

2. SPECIFIC PERFORMANCE—CONTRACT TO MAKE WILL.—Where a father, for a valuable consideration, agreed to will land to his daughter, and did execute such a will, but afterwards destroyed it, his contract to execute a will, after his death, will be enforced as against his other heirs. (Page 39.)

Appeal from Perry Chancery Court; *Jeremiah G. Wallace,* Chancellor; affirmed.

STATEMENT BY THE COURT.

Appellants brought this suit in the Perry Chancery Court on January 22, 1908, for partition of certain lands, which are described in the complaint, alleging that the parties were the joint owners and entitled to partition.

Appellee answered, denying the joint ownership and joint possession of the lands, and alleging that she was the sole owner. She made her answer a cross complaint, and set up in the cross complaint that she was the owner by reason of a will from her father, H. L. Trundle. She set up that her father, in the year 1897, while he was living with appellee and her husband, came to her and said: "I have been making my home with you and your husband for a number of years, and desire to continue to make your home my home until I die, and in consideration of what you have already done for me, and, in consideration that you and your husband let me live with you and you take care of me during the balance of my life, I will make you a deed to what is known as the Ed. Trundle place that I own." She alleges that she accepted the proposition to take care of him, and that about 1903 he came to her with what he called his will and said it was the same as a deed to what was known as the Ed. Trundle place, and delivered the same to her with other deeds that he said were the title papers to the land. She alleged that he stated that he wanted her to put this will or deed, together with the title papers, in her trunk and to lock them up, and to not let any one —not even himself—have possession of them; that the will or deed and the title papers belonged to her, and that he did not want her to put it on record until after his death; that he wanted the use and rents until his death, but after his death for her to have it put on record; that in accordance with his request she put the will, or deed, as he called it, in her trunk with the title papers and locked them up. She further alleged that some time after her father went to Little Rock in the spring of 1906 she missed the will or deed out of her trunk from the title papers. She didn't know whether she missed the will just before or just after her father died.

She alleged that the lands were not worth exceeding twelve or fifteen hundred dollars; that the board and waiting upon her father were worth $120 per year for at least twelve years of his life, and that she had fully paid for the lands in controversy by caring for her father during the time he lived with them. And she prayed for specific performance.

The appellants replied to the answer and cross complaint, denying the execution of the will set up therein, and alleged

in the alternative that if such a will was ever executed it was revoked and destroyed by appellee's father long prior to his death. Appellants further denied the alleged contract set up by appellee as between herself and her father whereby he was to give her the property in consideration of her taking care of him in his declining years.

There was an agreed statement of facts to the effect that all the parties to the suit are heirs of H. L. Trundle and joint owners of the land in controversy, with interest therein as set out in the complaint unless the said H. L. Trundle made a valid devise of the land to appellee.

The court in its decree, made the following findings of fact: "That H. L. Trundle died July 15, 1906; that prior to his death, about the year 1897, he executed an instrument of writing, attested by W. A. Isgrig and Robt. E. McCarty, who signed their names as attesting witnesses at the request of Trundle, who stated to them at the time that it was his last will, and by which he disposed of the lands involved to his daughter, Ruth L. Shelton; that at the time of the execution of the instrument aforesaid Trundle was of sound mind and disposing memory; that Trundle was then making his home at his said daughter's, and had done so for a long time before the execution of the instrument of writing mentioned, and continued thereafter to make his home with her until his death."

The court further found "that a material consideration inducing Trundle to make said instrument of writing conveying the lands to his daughter was that he lived with her and her family, and that she should take care of him throughout his old age, in the future as in the past, until his death, which she agreed to do and did do, and that in consideration thereof he delivered the instrument of writing to her, together with all title papers to the lands in controversy, and stated to her at the time that the package contained his deed or will to her to the Ed. Trundle place, together with all the title papers to the lands, and requested her to safely keep them until his death; that they were hers, but he wanted the rents of the lands until his death, and after his death for her to have the same put on record."

The court further found "that some time during the

month of March, 1906, prior to Trundle's death (which occurred in July of that year), he, by some means unknown to her and without her knowledge or consent, got possession of the will or deed and destroyed the same by burning it."

The court further found "that at the time Trundle obtained possession of the aforesaid instrument of writing and destroyed it he was in his 89th year, was extremely frail in both body and mind, and was laboring under *senile dementia*; that Ruth Shelton, in good faith, complied with all the terms and conditions upon which the instrument of writing was executed and delivered to her by giving him, the said Trundle, a home at her house with herself and family and by supporting and caring for him until his death; that, by reason of the destruction of the instrument of writing aforesaid in the manner aforesaid, it could not then be definitely determined as to what the character of the writing was."

The court declared that the instrument of writing in any event amounted to a contract upon the part of Trundle, for a valuable consideration, to convey to Ruth L. Shelton the lands involved in this suit, and entered a decree dismissing the suit for want of equity and awarding appellee specific performance by divesting title to the lands in controversy out of the appellants and vesting title to same in the appellee, and awarding her possession, rents since this suit began, etc. The appellants duly prosecute this appeal.

Other facts stated in the opinion.

*Sellers & Sellers,* for appellants.

1. It is conceded that the evidence is sufficient to establish the fact of the execution of a will—also that it was revoked and destroyed. But proof of the bald fact of the execution of a will is not sufficient to establish its contents. Declarations of the testator are admissible to prove the execution of a will, but are never sufficient in themselves to prove the contents. 73 Ark. 20; 50 Neb. 290; 7 B. Mon. 408; 5 Rawle (Pa.) 235; 14 Bush 434. The proof of the will must be of the whole contents. 8 Met. (Mass.) 487; *Id.* 490; 6 Gill 169; 5 Harr. (Del.) 178; 13 Col. 546; 5 Redf. (N. Y.) 372; 6 Dem. (N. Y.) 31. As to lost wills, the manner of establishing the same in this State is regulated by statute, and this statutory

remedy is exclusive.  Kirby's Digest, § 8065;  72 Ark. 381. It places the burden on the party seeking to establish the will to show that it was "in existence at the time of the death of the testator" or was "fraudulently destroyed during his lifetime." No proof to this effect was made or offered.  On the other hand, there is affirmative proof that the testator destroyed the will, *animo revocandi*, several months prior to his death, and his statements, oral and written, to that effect were admissible to show its revocation.  76 S. W. (Tex.) 754.

The testimony does not sustain the finding in the decree that the testator was, at the time he destroyed the will, mentally unsound—suffering from *senile dementia*.  66 Ark. 629; 49 Ark. 367;  87 Ark. 279.

2.  Under the proof no consideration was paid by Mrs. Shelton, but, on the contrary, the evidence shows that Trundle many times overpaid the Sheltons for all they ever did for him.

3.  There is no proof of a valid contract to make a will. Under the statute of frauds, a contract to devise specific lands in consideration of services to be rendered, to be valid, must be in writing.  8 Am. & Eng. Enc. of L. (2 ed.), 1018;  20 Cyc. 235.  In this case there was no part performance to take contract out of the statute.  Payment of a consideration is not sufficient.  70 Ark. 351.;  4 Pom. Eq. § 1409;  58 Atl. 337; 11 Am. St. Rep. 46;  62 Ala. 579;  81 Ala. 563;  17 Am. St. Rep. 125, 127;  53 Wis. 317;  21 Ark. 537;  44 Ark. 343.

4.  The instrument in question can not be treated as a written contract to make a will, because the testimony is undisputed that it was testamentary in character, and therefore revocable, and that it was revoked.  26 Am. & Eng. Enc. of L. (2 ed.), 92;  54 Am. St. Rep. 471.

5.  The testimony is not sufficient to establish even a verbal contract to make a will.  Contracts of this kind are closely scrutinized, and the evidence to establish them must be of the clearest and strongest.  54 Am. St. Rep. 472.  And likewise the courts always subject to the closest scrutiny testimony as to oral statements of persons who are dead.  17 Cyc. 808; 21 How. 493;  16 L. Ed. 207;  45 Am. St. Rep. 94;  53 Mo. 395; 12 La. Ann. 401;  14 La. Ann. 275;  37 La. Ann. 873;  35 La Ann. 1907;  46 Mo. 423;  17 Cyc. 808, cases cited in notes.

*P. H. Prince,* for appellee.

Trundle had the right to contract with Mrs. Shelton to convey the land to her in consideration of what she had done for him, and that she would take care of him during the remainder of his life. Pursuant to such contract, he delivered into her keeping the will, being a part of the contract, which act, and the performance by her of her part of the contract, took the transaction out of the statute of frauds, and was binding upon him during his lifetime, and thereafter upon his heirs. He then had no moral nor legal right to destroy the will. If he was mentally sound at the time he did so, it was a fraud upon the rights of appellee. But the evidence shows that at the time he destroyed the will he was in a state of *senile dementia,* and the chancellor so found.

Appellee, having fully performed the contract and identified by sufficient evidence the lands contracted and intended to be conveyed, is entitled to have specific performance. 8 Am. & Eng. Enc. of L. (2 ed.) 1017; *Id.* 1018; *Id.* 1020; 12 N. J. Eq. 146; 85 Hun (N. Y.), 263-265, 55 N. Y. 555; 30 Am. & Eng. Enc. of L. (2 ed.) 620; 14 Cur. Law. 2410; 125 N. W. 998; 124 N. W. 52; 91 N. E. 420; 108 Pac. 994; 12 Cur. Law 23, 24; 14 *Id.* 1961; 122 N. W. 852; 64 S. E. 927; 1 Ark. 391; 15 Ark. 315; 19 Ark. 49; 66 Ark. 333; 11 Am. & Eng. Enc. of L. (2 ed.) 180; *Id.* 184.

WOOD, J., (after stating the facts). 1. In 1892 the appellee was married to W. R. Shelton. She was the youngest daughter of H. L. Trundle, and was living with her father on what is known as the old home place, keeping house for him, her mother being dead. She and her husband continued to reside on the old home place with her father for three years. After this she and her husband moved to Houston, Perry County, where they lived nearly three years. After this they moved to Perryville, where they continued to reside for six years. After this they moved to Houston, where appellee's home was at the time her deposition was taken. During all this time, and, in fact, until July 15, 1906, when H. L. Trundle died, he had made his home with appellee. During this time he had visited his other children, staying sometimes for three months with them, but he considered that his home was at appellee's. About six years before his death he had spent the winter

in Little Rock at his daughter's, Mrs. Kirkwood's. During the time that he stayed at Mrs. Kirkwood's he paid her at the rate of $2 a week for his board. Mr. Trundle was a man of pride, and as long as he had any property it seemed to be his desire to reimburse his children for any attention that they were called upon to give him in his old age, and he was anxious to take care of himself as far as possible and not to be a burden on any of his children.

About the year 1897 appellee and her father, according to her testimony, entered into a contract whereby he proposed to deed or will to appellee what is known as the "Ed. Trundle place," in consideration that appellee and her husband should take care of him the balance of his life. She testified her father wanted the benefit of the place during his life, but that after he was gone it was for her; that he had given all the other children all he thought they were entitled to, and that he thought for what she had done for him during his last days she was entitled to it. She said that she considered that it was worth as much as $10 per month to board and take care of her father; that he lived with her and she continued to provide for him and to take care of him in his old age.

After she had the understanding and conversation with her father about taking care of him in his old age, in about the year 1903, he brought her a package of papers containing what he called his will or deed to the Ed. Trundle place. "When he delivered the package," she says, "he told me there was a will or deed to the Ed. Trundle place, and I looked in it, and found that there was contained in the package the will and three deeds." She said: The paper inclosing the will and the three deeds in which the Ed. Trundle place was described contained the following indorsement: "Will and deeds to the Ed. Trundle Place," and on both ends of the package was the indorsement, "Ruth Shelton." The deeds were made exhibits. The deeds were mesne conveyances from various parties to the Ed. Trundle place. The indorsements on the wrapper were in the handwriting of H. L. Trundle.

She says: "My father, at the time he delivered me the package of papers, told me to lock them up and told me to let no one have them; that they were mine."

Other witnesses corroborated the testimony of the appellee.

One witness testified that in 1897 or 1898 he witnessed a will for H. L. Trundle; that Trundle told him at the time he "was conveying all of his property to his daughter Ruthie; he said a number of times that Ruthie would get all he had at his death. H. L. Trundle at the time owned the Ed. Trundle place. He was making his home at that time with Mr. and Mrs. Shelton, and he continued to make his home with them after he made the will until his death."

Another witness testified that he married one of H. L. Trundle's daughters; that he talked frequently with Trundle during the latter part of his life, and knew that he willed the Ed. Trundle place to Ruth Shelton. He saw the will; H. L. Trundle showed it to him, and told him what he had done. H. L. Trundle said: "She should have the place as she was going to take care of him as long as he lived." He called her place his home; had visited around with his other children. He was at witness' house a few times. It was some five years before his death when he showed witness his will, at witness' house. Witness read a part of it, and saw the Ed. Trundle place mentioned in the will, and saw the numbers of the land in the will. He didn't notice that it mentioned anything except the Ed. Trundle place and gave the numbers of the land.

Another witness testified that he was a son-in-law of H. L. Trundle; that he made his home at witness' house part of the time, and Little Rock part of the time, with Mrs. Kirkwood, but most of the time his home was at Ruth L. Shelton's. He always called Ruth Shelton's place his home and kept his things there.

Another witness testified that about the year 1906 he stayed all night at Shelton's house and slept in the same room with H. L. Trundle, and had a conversation with him in which he told witness that he willed the Ed. Trundle place to Ruth L. Shelton; that he had made his home with her since his wife died, and that she had been very good to him. At that time he was very weak and feeble, and had to have fires built for him at night, and he told witness that she built fires for him; that he had to have them; that "Ruthie" built them most of the time, and that her husband, Mr. Shelton, built them some of the time.

Another witness, who had known H. L. Trundle for twenty-

seven or twenty-eight years, said that while Trundle was living with Shelton at Houston he came to witness' store and talked to him a good deal.   In these conversations he told witness that "Ruthie was his youngest child, and that he preferred to live with her, and that he would make his home with her the balance of his life; that he had willed Mrs. Shelton the Ed. Trundle place."

Another witness testified that he had known H. L. Trundle for twenty-three years;   that Trundle talked to him about deeding the Ed. Trundle place to his daughter, Ruthie, in 1896, when he was speaking about his business generally;   said he "was going to make the place known as the Ed. Trundle place over to Ruthie, or that he had done so."   The last time witness talked with Trundle was at Perryville in 1905, and there Trundle told witness "that he had deeded the Ed. Trundle place to his daughter, Ruthie."

We are of the opinion, in view of the above testimony, that the finding of the court that there was "a contract upon the part of Trundle, moved by consideration, to convey to Ruth L. Shelton the lands involved in this suit" is in accord with the testimony.

The testimony also warranted the finding of the court that there was "a material consideration inducing Trundle to make said instrument of writing conveying the lands to his daughter, which was that he had been living with her and her family, and that she would take care of him throughout his old age, in the future as in the past, until his death, which she agreed to do and did do;"   and also "that, in consideration of the above services, he delivered said instrument of writing to the said Ruth L. Shelton, together with all title papers involved in this case."

The testimony of the appellee shows that there was a contract between her and her father by which she was to render him certain services in the future, and, that in consideration for these services and also the services that she had performed for her father in the past, he was to deed or will to her what is described in the testimony as the "Ed. Trundle place."   The testimony shows that she had complied with the contract on her part by rendering the services called for by the contract, and that these services were valuable.   The testimony also

shows that her father also executed the contract on his part, afterwards making the will and delivering the same to the appellee. Here the verbal contract to make a future conveyance of land by will or deed was afterwards performed by appellee rendering the services which were the consideration for the conveyance by the father, and her father executed the will and delivered the same to the appellee in accordance with his contract. Therefore, conceding that the contract at first would have been within the statute of frauds requiring agreement for the conveyance of land to be in writing, still this contract was taken out of the statute by the full performance thereof by appellee and by the making of the will or deed on the part of Trundle. Section 14, Current Law, 2410-11, note 89; *Dalby* v. *Maxfield*, 244 Ill. 214.

The testimony of the appellee was definite and certain to the effect that in consideration of her services to him her father was to make her a deed or will to the "Ed. Trundle place;" and her testimony and the testimony of other witnesses shows that the contract was recognized as binding on the part of her father by his making a will and delivering the same to her which described the "Ed. Trundle place." That the will was to be made and was afterwards executed in accordance with the contract is established by clear and convincing testimony.

2. In the spring of 1906, H. L. Trundle wrote to his son-in-law, J. E. Little, as follows:

"I don't want Shelton to have the benefit of another dollar that I can avoid. You know that I have deeded that place to Ruthie and the children. It is more than likely that Ruthie will not live to be very old, but will likely go off young like the balance of her sisters, for she takes very little care of her health. If she were to die off, young Shelton would have the benefit of that land until the children became of age. He is certainly the most obnoxious man, in my judgment, that I ever met with."

A few weeks after this letter he wrote another letter to the same party stating: "I have burned that document which I wrote to you about."

Other witnesses testified that Trundle, a short while before his death, was complaining because Shelton had refused to let him (Trundle) have a buggy and horse to go down on

the farm. In one of his letters to his son-in-law Little he complained that no one seemed to take any interest in him, and said he believed they would be glad if he could drop out. But it appears from the testimony that the reason given for his dislike for Shelton a short time before his death was that he (Shelton) had refused to let him (Trundle) have a horse and buggy to go down on the farm. Trundle told his brother that he had destroyed the will because Shelton had refused to let him have his buggy and horse.

Trundle told another witness: "The way Shelton had treated him, he was not going to let him have it; that he had asked for a horse and buggy, and Shelton had refused him." He further said to this witness: "I think a heap of Ruthie and the children, but I am not going to let them have my property. I burned the will this morning, and after I am dead if you hear them inquiring about the will you will tell them that I burned it."

The appellee explains the reason for her husband's conduct in refusing him the horse and buggy as follows: "During the winter of 1905-6 and the spring of 1906, he was sick, cross and fretful. We objected to his taking trips alone, as it was too hard on him, and one time the last year of his life he took my little boy and went to the Ed. Trundle place on the river, got sick and had to be brought home. After this we didn't want him to have a horse and buggy alone. He asked for a buggy and horse, and I objected and told Mr. Shelton about it, and Mr. Shelton tried to reason with him that he was too weak and feeble to make the trip to his place. My father got very angry with Mr. Shelton because he didn't furnish him the horse and buggy."

The appellee further testified that her father's mind at this time "was bad—was weak, and his body was weak." She says: "He was very fractious; he had never been that way before; we thought from the way he was acting he would not be here long; it was about the middle of February, 1906, when he wanted this buggy and horse; the weather was cold and the roads muddy."

Other witnesses to whom Trundle complained of the conduct of Shelton in not letting him have the horse and buggy say that he "was very weak and feeble." Trundle's

own brother stated: "He (Trundle) made a trip to his farm in the winter or spring of 1906, and it made him sick;" "he took cold and suffered for several weeks from it. This was the trip that Shelton had refused to let him have the buggy and horse." This witness testified also that "he never knew of Shelton or appellee mistreating his brother." The appellee's testimony shows that her husband was very indulgent and kind to her father in his old age; that neither she nor her husband ever at any time mistreated him. On the contrary, they gave him the best treatment they could; they would get up at night and wait on him, and Shelton would bring in wood and make him fires and set up with him at night. At the time he wrote the letter to his son-in-law, Little, stating that he had burned the document, "he was in a very bad, weak and feeble condition," and appellee and her husband "didn't think that he was at himself."

The above testimony shows conclusively that Trundle destroyed the will that he had made to appellee. It also shows the reason why he destroyed it and the condition of his body and mind at the time of its destruction.

The testimony is hardly sufficient to justify the finding of the court that Trundle was laboring under *senile dementia* at the time he destroyed the will. It reveals him as enfeebled by age and disease, weak in mind and body, fractious and easily disconcerted, but it does not go to the extent of showing that he did not possess mental capacity sufficient to enable him to understand the effect of his conduct in the destruction of the will. The only question, therefore, is whether or not H. L. Trundle, after having entered into the contract on his part to make a will, could afterwards by revoking the same deprive appellee of the right to have specific performance of the contract, against the other heirs of Trundle, to convey to her the Ed. Trundle place the same as if the will had not been destroyed.

As we have seen, the contract was taken out of the statute of frauds by the acts of the parties; but, as the will could only take effect after Trundle's death, his revocation by the destruction thereof left appellee to resort to the contract. The will was destroyed, but that did not destroy the contract by

which her father bound himself to make a will of the land to appellee.

In *Maddox* v. *Rowe*, 23 Ga. 431, it was said: "The father made in writing what he thought was his will, and in that writing he said that he gave the two lots of land in controversy to the son. The contract on his side was that he should give these two lots to the son. Here then is a writing that may serve to help to prove the contract. The case is such therefore that it is not left wholly at the mercy of parol evidence. True, this writing was void as a will, but that did not prevent it from being good to help prove the contract."

So here, the making and delivery of the will, taken in connection with the other testimony, was sufficient to show that Trundle had entered into the contract.

The contract being proved, appellee should have specific performance thereof against the other heirs of Trundle by having them convey to her the Ed. Trundle place the same as if the will had not been destroyed.

In the case of *Johnson* v. *Hubbell*, 10 N. J. Eq. 332, 66 Am. Dec. 773, it is said: "There can be no doubt but that a person may make a valid agreement, binding himself legally to make a particular disposition of his property by last will and testament. The law permits a man to dispose of his own property at his pleasure, and no good reason can be assigned why he can not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose, as well by will as by a conveyance to be made at some specified future period, or upon the happening of some future event. It may be unwise for a man in this way to embarrass himself as to the final disposition of his property, but he is the disposer, by law, of his own fortune, and the sole and best judge as to the time and manner of disposing of it. A court of equity will decree the specific performance of such an agreement upon the recognized principles by which it is governed in the exercise of this branch of its jurisdiction."

In *Bolman* v. *Overall*, 80 Ga. 451, it is held, (quoting syllabus): "A will giving property to one in consideration of personal services rendered and to be rendered to the testator is valid and may be enforced as a contract after the testator's death." *Baker* v. *Syfritt*, 125 N. W. 998, cases cited and head-

note for other cases; *Carmichael* v. *Carmichael*, 72 Mich. 76, 16 Am. St. Rep. 528, and note on p. 536; *Gupton* v. *Gupton*, 47 Mo. 37; *Bird* v. *Pope*, 73 Mich. 483; 8 Am. & Eng. Enc. Law, (2 ed.) 1017, and other cases cited in note 6. See also p. 1020, note 5; *Hespin* v. *Wendeln*, 85 Neb. 172.

We conclude, therefore, that the chancellor was correct in dismissing the complaint of the appellants for want of equity, and in decreeing a specific performance in favor of the appellee according to the prayer of her cross complaint.

The judgment is therefore affirmed.