ROGERS *v.* HOSKINS.

4-8196                                      201 S. W. 2d 1004

Opinion delivered May 12, 1947.

*Sullins & Perkins,* for appellant.

*Price Dickson* and *Karl Greenhaw,* for appellee.

MINOR W. MILLWEE, Justice.  Plaintiff, Nettie Hoskins, is a daughter and one of the heirs at law of J. J. Rogers, deceased, who died intestate at Elkins, Washington county, Arkansas, in December, 1945.  Defendants are four sons, three daughters and eight children of a deceased son of J. J. Rogers, deceased, and are his other heirs at law.  Two of the sons were made defendants in their capacity as administrators of the J. J. Rogers estate, and the wives of the four sons are also defendants.

Plaintiff alleged in her complaint that several years before his death J. J. Rogers orally offered to purchase a home for plaintiff if she and her family would move from their home at Japton, Madison county, Arkansas, to Elkins in Washington county and keep house for him; that the offer was accepted and the family moved to Elkins and plaintiff performed the household duties in full reliance upon the oral offer to purchase a home for her; that thereafter her father, after ascertaining that the place was suitable to plaintiff, purchased the prop-

erty in controversy and agreed that same should become plaintiff's property at his death; that in recognition of his promise, J. J. Rogers executed and acknowledged a warranty deed conveying the property to plaintiff; that plaintiff faithfully performed her part of said agreement and did the cooking, washing, ironing and other household duties for her father for several years until his death in 1945, and was entitled to specific performance of said contract. The prayer of the complaint was that plaintiff be decreed to be the owner of the property and that her title thereto be quieted and confirmed against the defendants.

The defendants, except Amanda Johnson, a daughter of J. J. Rogers, deceased, answered and denied the allegations of the complaint. It was admitted that J. J. Rogers was the owner of the lands described in the complaint and that he obtained title thereto in the manner set forth in the complaint. The answer further alleged that if a deed was executed to plaintiff, same was void because it was never delivered and that J. J. Rogers died seized and possessed of the lands in controversy. The statute of frauds was also pleaded in bar of the alleged contract.

The cause was heard on oral testimony before the chancellor and a decree entered in favor of plaintiff directing specific performance of the contract. Defendants were ordered to execute and deliver a deed to plaintiff within 30 days and, upon their failure to do so, the clerk was appointed commissioner and directed to execute and deliver the deed to plaintiff. All costs were taxed against the estate of J. J. Rogers, deceased.

The defendants, except Amanda Johnson, prosecute this appeal to reverse the decree for specific performance. Plaintiff and defendant, Amanda Johnson, have cross-appealed from that part of the decree taxing all costs against the J. J. Rogers estate.

The testimony on behalf of plaintiff tends to establish the following facts:

J. J. Rogers lived at Japton, Madison county, Arkansas, for many years, where he and his wife reared a large family. In 1929, he sold and conveyed to plaintiff and her husband, Chester Hoskins, a 23-acre farm where the Hoskins made their home until 1934. At that time J. J. Rogers had acquired business and farming interests, including a canning factory, at Elkins in Washington county, Arkansas. These interests required his presence in Elkins, and it became necessary to have someone keep house for him there. Mrs. Rogers preferred to live in her home and remain among friends and relatives at Japton and declined to move to Elkins. In 1934, J. J. Rogers proposed to plaintiff and her husband that, if they would reconvey their Madison county home to him and move to Elkins and keep house and care for him the rest of his life, he would purchase a more suitable place for them at Elkins. Plaintiff and her husband reconveyed the Madison county land and the family moved to Elkins with her father.

Plaintiff and her family lived with her father in Elkins and she performed the household duties until 1937 when her young daughter died. Her parents thought it would be better for plaintiff to leave Elkins for a while and the Hoskins family moved to Gentry where the husband worked with his brother in the timber business. Mrs. Rogers, who had undertaken the household duties in Elkins, became dissatisfied and returned to Japton. In 1938, plaintiff and her family moved back to Elkins with J. J. Rogers at the request of both parents, after the father had renewed the offer to buy a home for plaintiff at Elkins.

After the return to Elkins, J. J. Rogers offered to purchase one place for plaintiff, but did not do so when it proved unsuitable to her. Mrs. Rogers died in 1942. In November, 1942, Mr. Rogers had an opportunity to buy the property in controversy, which was known as the Race property, and did purchase it after plaintiff viewed the place and stated that it was suitable. They lived in the Race property for about five months when J. J. Rogers purchased a larger place which was more con-

venient to the canning factory. They resided at this place and rented the Race property until his death in 1945, except for a period of three months in 1944.

On November 29, 1943, J. J. Rogers executed a warranty deed conveying the property in controversy to plaintiff, "subject to my lifetime estate." This conveyance recites a consideration of one dollar paid by plaintiff. It was placed in J. J. Rogers' box at the bank on the date it was executed and remained there until the grantor's death.

In January, 1944, a difficulty arose between plaintiff's father and husband and the latter was asked to leave. Hoskins went to Fayetteville where he was later joined by plaintiff and their children, except the two oldest sons who remained in Elkins with their grandfather. During the three months they resided in Fayetteville, plaintiff continued to do the laundry and to prepare and send food to her father. Mr. Rogers made several trips to Fayetteville and requested his daughter to return to Elkins. On several occasions he threatened to destroy the deed to plaintiff unless she returned and resumed housekeeping for him. Plaintiff and her family returned to Elkins in April, 1944, and plaintiff continued to keep house and care for her father until his death in December, 1945.

There was other testimony from witnesses who apparently had no interest in the suit to the effect that J. J. Rogers told them he bought the property in controversy for plaintiff and had deeded it to her.

Amanda Johnson, a sister of the plaintiff, lived in Japton where she served as postmaster for 12 years. She was made a party defendant to the suit, but declined to contest it. She testified against her own interest as an heir, that her father told her that plaintiff was the only one he could get to stay with him; that he had deeded the Race property to plaintiff and had said: "I am to have say-so of this deed all my life and then it is to go to her." After plaintiff moved to Fayetteville, Mr. Rogers requested Mrs. Johnson to go there and tell plaintiff that

he would destroy her deed if she did not come back and take care of him. Mrs. Johnson talked with plaintiff and she returned to Elkins. Mrs. Johnson, and other witnesses, testified that plaintiff was attentive to her father and worked hard doing the housework for her father and cooking for several of his farm hands.

Opposed to the evidence on behalf of plaintiff was that of several of the defendants who testified that they heard nothing of an agreement between plaintiff and her father until after the latter's death. There was other evidence that J. J. Rogers bought most of the groceries while plaintiff and her family lived with him. Two of the defendants, a brother and sister of plaintiff, testified that about the time their father was taken to a hospital in November, 1945, he told them in the presence of plaintiff and others that he wanted the bank cashier to come and write deeds conveying all his property to two of the sons so that it could be sold, the debts paid and the proceeds divided equally among the heirs. They also testified that plaintiff was present and stated that she did not want the Race property. This testimony was strongly refuted by plaintiff and other witnesses. J. J. Rogers did not die at the hospital, but returned home and improved in health to the extent that he made a trip to town and the bank where the deed to plaintiff was kept. He was in full possession of his mental faculties and there is no evidence that he attempted to make deeds to the two sons after he left the hospital.

The rule is well settled that before a court of equity may grant specific performance of an oral contract to convey lands the evidence of such agreement must be clear, satisfactory and convincing. In some of the cases it is said that it must be so strong as to be substantially beyond reasonable doubt. *Williams* v. *Williams,* 128 Ark. 1, 193 S. W. 82; *Walk* v. *Barrett,* 177 Ark. 265, 6 S. W. 2d 310; *Kranz* v. *Kranz, et al.,* 203 Ark. 1147, 158 S. W. 2d 926.

Defendants earnestly insist that the testimony in the case at bar does not meet the test of the above rule and that there is such indefiniteness and uncertainty as to

both the terms of the contract and its performance as to render it unenforceable in equity. It is first contended that there is no evidence that the offer of J. J. Rogers was accepted by plaintiff. In 17 C. J. S., Contracts, § 41, p. 374, it is said: "An acceptance of an offer may be by act, as where an offer is made that the offerer will pay or do something else, if the offeree shall do a particular thing. In such a case performance is the only thing needful to complete the agreement and to create a binding promise, as where a person proposes to another to work for him and the other enters on the work." See, also, *Southern Surety Co.* v. *Phillips*, 181 Ark. 14, 24 S. W. 2d 870, which is cited in support of the statement of the textwriter. There was abundant evidence of performance by plaintiff which was sufficient to constitute an acceptance of the offer made by her father in the absence of a formal statement showing such acceptance.

It was shown that in May, 1945, J. J. Rogers mortgaged his property, including the property in controversy, for a loan of $5,000. Defendants insist that the giving of the mortgage indicates that Rogers did not intend for plaintiff to have the property in controversy. The giving of this mortgage was not inconsistent with either the grant in the deed to plaintiff or the contract with her father. In *Walker* v. *Eller*, 178 Ark. 183, 10 S. W. 2d 14, this court held that it was not inconsistent for the owner of land to lease it for a term of years after he had executed a will devising it to someone other than the lessee. The giving of the mortgage when considered with the other facts did not amount to an attempt by J. J. Rogers to renounce his contract with plaintiff.

It is also contended that plaintiff is barred by the statute of frauds. In *Fred* v. *Asbury*, 105 Ark. 494, 152 S. W. 155, the court held that where an intestate verbally agreed that, if plaintiffs would give up their employment, change their residence and care for him the rest of his life, he would leave them all his property at his death, and plaintiffs complied with the agreement, their conduct was such as would take the contract out of the statute of frauds. In reaching this conclusion the court

quoted the language of Mr. Justice HEMINGWAY in *Hinkle* v. *Hinkle,* 55 Ark. 583, 18 S. W. 1049, as follows: ''But the defendant.pleads the statute of frauds, and the question is, if the statute applies, whether there has been such performance as to take the case out of its operation. Martin did everything he agreed to do. He gave up his employment, changed his residence, assisted in caring for his mother and in managing and conducting the business, moved upon the land and expended money in improving it. If the statute could defeat his claim, it would become a means of fraud, not of its prevention.'' Defendants contend that this rule is inapplicable here because plaintiff was not placed in possession of the Race property. The evidence discloses that the parties to the contract resided in the Race property about five months, but were not living there at the time the father died. Although possession is one of the elements that eliminates the statute of frauds, the above rule was applied in *Fred* v. *Asbury, supra,* where the parties who were granted specific performance lived in their own home and were not in possession of property which it was orally agreed should be given them upon the death of the donor.

In 49 Am. Jur., Statute of Frauds, p. 695, it is said: ''Although an undelivered deed is deemed insufficient to take the contract out of the statute, it may be of importance for the purpose of showing a recognition by the vendor of the purchaser's contractual rights under which the latter has taken possession, made improvements, or performed other acts which will take the contract out the statute under the equitable doctrine of part performance.''

In *Naylor* v. *Shelton,* 102 Ark. 30, 143 S. W. 17, Ann. Cas. 1914A, 394, a father agreed to will or deed a certain place to his daughter if she and her husband should take care of him the rest of his life. The father executed a will, but later destroyed it. It was held that the contract was taken out of the statute of frauds by full performance and by the making of the will. The court said: ''As we have seen the contract was taken out of the statute of

frauds by the acts of the parties; but, as the will could only take effect after Trundle's death, his revocation by the destruction thereof left appellee to resort to the contract. The will was destroyed, but that did not destroy the contract by which the father bound himself to make a will of the land to appellee.'' The deed made by J. J. Rogers under the circumstances in evidence tends to show his recognition of the contract with plaintiff and is a strong circumstance that the contract existed.

Defendants also argue that plaintiff breached and forfeited her contract by leaving twice. It is undisputed that plaintiff left the first time at the sugggestion of her parents, after the loss of her child, and that she returned when the parents made that request. When plaintiff went to Fayetteville her father did not treat the contract as rescinded, although he threatened to do so unless she returned and continued to perform the contract. Plaintiff did return and continued the performance of her duties under the contract for more than 18 months and until her father died. Any breach of the contract on her part was waived by the father.

Defendants rely strongly on the case of *Lay* v. *Lay*, 75 Ark. 526, 87 S. W. 1026. We think the facts in that case are distinguishable from those in the case at bar. In the Lay case the court emphasized the fact that no deed was made and that plaintiff never claimed the property as his own, but always referred to it as his father's land. The father likewise claimed the land as his own until his death, although the contract was alleged to have been made some five years prior thereto.

We conclude that the chancellor was correct in holding that plaintiff established the agreement with her father by clear, satisfactory and convincing evidence, and that there was full performance of the terms of the contract by plaintiff. Having reached this conclusion, it is unnecessary to determine whether error was committed under § 5154, Pope's Digest, in refusing to allow plaintiff to testify concerning transactions and conversations with her father, while defendant brothers and sisters were permitted to do so.

Plaintiff and her sister, Amanda Johnson, appealed from that part of the decree which adjudged all costs against the estate of J. J. Rogers, deceased. Amanda Johnson was made a party defendant, but did not resist the suit and recognized the validity of the contract between plaintiff and her father. Plaintiff having won her suit and Amanda Johnson not having resisted it, their proportionate parts of the estate should not be charged with the court costs.

It follows that the decree will be modified so as to tax all court costs against the individual defendants who resisted the suit. As thus modified, the decree is affirmed.