## FRED v. ASBURY.

### Opinion delivered December 16, 1912.

1. ADMINISTRATION—STATUTE OF NONCLAIM—APPLICATION.—The statute of nonclaim, providing that all claims against estates of deceased persons shall be barred unless they are properly authenticated and presented to the executor or administrator within one year after the grant of letters, does not refer to claims of title or for the recovery of property, as claims of such a character are not claims against the estate of the deceased. (Page 499.)

2. FRAUDS, STATUTE OF—EFFECT OF PERFORMANCE.—Where intestate verbally agreed that, if plaintiffs would give up their employment, change their residence and take care of him for the rest of his life, he would leave them all of his property, real and personal, at his death, and plaintiffs complied therewith, their conduct was such a performance as would take the contract out of the statute of frauds. (Page 499.)

Appeal from Greene Chancery Court; *Charles D. Frierson* Chancellor; affirmed.

### STATEMENT BY THE COURT.

On March 9, 1911, Chas. E. Asbury and Inza V. Asbury, his wife, instituted this action in the chancery court against Anson E. Randol, administrator of the estate of Jacob Fred,

deceased, and the brothers and sisters of Jacob Fred, whose names are, George W. Fred, John W. Fred, Elizabeth Pickering and Becky Ann Apple. The plaintiffs in their complaint alleged that in October, 1905, in the State of Indiana, Jacob Fred contracted and agreed with them that if they would move with him from their old home in Lawrence, Indiana, to Greene County, Arkansas, and live with him and take care of him in sickness and health as long as he should live, he would give them all of the property which he owned at the time of his death; that pursuant to this contract on November 13, 1905, they and Jacob Fred moved from their old home in Indiana to Greene County, Arkansas; that they established and provided a home for Jacob Fred with themselves and continuously took care of him in sickness and in health until his death on December 1, 1910. The prayer of the complaint is that the plaintiffs be decreed to be the owners of the entire estate of the said Jacob Fred, deceased.

The defendants, George W. Fred, John W. Fred and Elizabeth Pickering, answered and averred that Jacob Fred died, intestate, in Greene County, Arkansas, in the year 1910, and that letters of administration were granted upon his estate on December 14, 1910, to Anson E. Randol, who qualified as such administrator and took charge of the estate. Defendants further averred that if plaintiffs had any claim against said estate they have failed to present the same to the administrator within one year after the grant of letters of administration, and pleaded the statute of nonclaim of one year in bar of the plaintiff's right to recover.

The defendants also plead the statute of frauds in bar of the alleged sale or gift of the property to the plaintiffs.

There was an agreed statement of facts, which in substance is as follows: Jacob Fred owned certain real estate and a short time prior to his death contracted orally to sell the same to Geo. W. Fred for the consideration of three thousand dollars. In pursuance of the oral contract, Geo. W. Fred paid to Jacob Fred five hundred dollars of the purchase money. Jacob Fred died in the possession of his property, and Geo. W. Fred at the time lived in the State of Indiana. After the death of Jacob Fred the brothers and sisters of Geo. W. Fred, who were the legal heirs of the said Jacob Fred, made deeds

to Geo. W. Fred to their interest in said lands.   Geo. W. Fred paid twenty-five hundred dollars, the balance of the purchase money, to Anson E. Randol, the administrator of the estate of Jacob Fred, deceased.   At the time these deeds were executed none of the defendants who have answered in this case knew of the plaintiffs' claim.

Inza V. Asbury, one of the plaintiffs, testified: "I lived with Jacob Fred nearly four years in Indiana before coming to Arkansas.   I married Chas. Asbury, July 17, 1905, in Indianapolis, Indiana.   Jacob Fred (my uncle) was present. I was eighteen years old when I married.   Two days after our marriage Jacob Fred proposed to us that, if we would come and live with him, he would bear one-half of the expenses of what we all ate, and would leave us all the property that he owned at the time of his death.   Jacob Fred was unmarried and was a cripple.   He had rheumatism sometimes, and had to walk with a crutch, and sometimes with two crutches. We lived with him in Indiana until we came to Arkansas. Some time about the last of October or the first of November, 1905, Jacob Fred, told us that, if we would come to Arkansas and take care of him and give him a home as long as he lived, he would furnish one-half the provisions and would give us all he had when he died.   In pursuance of this agreement, we all came together to Greene County, Arkansas, and lived together in one house nearly five years until Jacob Fred died. He died December 1, 1910, at our house.   During the time we lived in Arkansas Jacob Fred bought a store in Marmaduke and boarded at Anna Asbury's about three weeks.   During all the rest of the time he lived at our house, and we did everything for him we possibly could and always treated him kindly. He was a cripple, having had his left hip put out of place when he was fourteen years of age.   During the time we lived in Arkansas he had dropsy, rheumatism and heart trouble.   In fact, he was sick most of the time, and in addition to providing him with a home I nursed and took care of him.   He became old and childish at times, but we just let him have his own way about everything."

Chas. E. Asbury testified to practically the same state of facts, and in addition stated that he had a good job in Indiana, and did not care about coming to Arkansas; that he

only came in pursuance of the promises and agreement made with the said Jacob Fred.

Several of the near neighbors of Jacob Fred in Indiana testified that Jacob Fred told them that he had made an agreement with the plaintiffs to move to Greene County, Arkansas, with him and there provide a home and nurse and care for him until he died, and that in consideration therefor he was to leave them all the property he owned at the time of his death. Among the others who testified to this effect was Becky Ann Apple, the sister of Jacob Fred. She testified that she had heard Jacob Fred tell the plaintiffs that, if they would move to Arkansas with him, provide a home and take care of him as long as he lived, he would give them all the property he owned at the time of his death. She said that this agreement was made between Jacob Fred and the plaintiffs. O. E. Apple and Ann I. Apple, the son and daughter of Rebecca Ann Apple, testified to the same effect. Ann I. Apple testified in addition that she lived with them about six weeks before they moved to Arkansas, and heard Jacob Fred say a number of times that he had made this agreement. She said she lived with plaintiffs in Arkansas from November 13, 1905, until October 22, 1906, and that Jacob Fred made his home with them during this time; that while she was there she heard him say several times that he had made this contract with the plaintiffs.

Other testimony was introduced which tended to show that Jacob Fred was never married, and that the plaintiff Inza V. Asbury was his illegitimate daughter.

The defendants introduced testimony to substantially the following effect: Jacob Fred was on good terms with his brothers and sisters, and never had any quarrel with any of them. He furnished something more than one-half of the table expenses during a part of the time he lived with the plaintiffs. During his last illness he endeavored to make a will. He said that he wanted his brothers and sisters to have two hundred and fifty dollars each, and the plaintiffs to have his household goods and what Chas. E. Asbury owed him and enough more to make out one thousand dollars. He said he wanted the rest of his property to go to some old men's home in Indiana. The plaintiff Inza Asbury objected to his making the will,

and said: "Uncle Jake, you are not going to treat us that way, are you?" She said: "You promised mother on her deathbed that you would give us all your property if we would live with you and keep house for you and take care of you during your lifetime." Jacob Fred had chronic Bright's disease and rheumatism; he soon became unconscious, and the will was never executed.

The chancellor found for the plaintiffs, and a decree was entered in their favor for the assets in the hands of the administrator. The defendants have appealed.

*Block & Kirsch, M. P. Huddleston* and *R. P. Taylor,* for appellants.

All demands subsisting at the time of the death of the testator or intestate, capable of being asserted in a court of justice, must be authenticated and exhibited within the time prescribed by the statute of nonclaim. 18 Ark. 334; 14 Ark. 248. This rule applies not only to ordinary contractual demands but also to those arising out of trusts, whether expressed or implied. 66 Ark. 327; 25 Ark. 318.

A claim may be asserted against the estate of a decedent either by presentation in the probate court or by action brought in a court of law or equity. Kirby's Dig., § 112; 7 Ark. 78; 97 Ark. 276. In either case it is an indispensable prerequisite to the presentation of the claim that it be authenticated in accordance with the requirements of the statute. Kirby's Dig., § § 114, 119.

Objection for failure to authenticate may be made at any time before judgment, by motion, plea or objection to introduction of testimony. 14 Ark. 248; Kirby's Dig., § 119; 14 Ark. 237; 48 Ark. 304; 66 Ark. 327.

*Johnson & Burr,* for appellees.

1. The contract was fully performed by appellees, and deceased accepted and enjoyed the benefits of such performance. The contract is not within the statute of frauds. 93 Ark. 606, 125 S. W. 1010; 199 Mo. 416; 97 S. W. 901; 77 Me. 70; 62 Mo. 114; 121 Tenn. 330; 1 C. C. A. 24.

2. Appellees are not barred by the statute of nonclaim. This is a suit involving the distribution, and not the corpus,

of the estate, and the statute of nonclaim does not apply. 127 N. W. 11, and authorities cited.

*Block & Kirsch, M. P. Huddleston* and *R. P. Taylor,* for appellants in reply.

Where there is a contract to devise real estate, or all of an estate of which part is land, such a contract is within the statute of frauds. 23 N. E. 1018; 5 N. E. 66; 59 N. W. 129; 26 N. E. 222; 72 N. W. 400; 45 N. E. 134; 22 N. E. 777; 61 N. E. 148; 87 S. W. 844; 48 Atl. 409; 64 N. W. 490; 19 S. E. 739; 103 Ill. 229.

HART, J., (after stating the facts). The statute of nonclaim is urged as a bar to the relief sought. This statute provides that all claims against estates of deceased persons shall be barred unless they are properly authenticated and presented to the executor or administrator within one year after the grant of letters; but this is not a proceeding to enforce a claim or demand against the estate of Jacob Fred, deceased, but is one to determine the rights of the parties to this suit to the property in question. The statute of nonclaim does not refer to claims of title or for the recovery of property for the reason that claims of such a character can not in any just sense be said to be claims against the estate of the deceased. On the contrary, the right to recover is based upon the fact that the property claimed does not belong to the estate, but belongs to the party asserting title to it. 18 Cyc. 456; *Krutsen v. Krock,* 127 N. W. (Minn.) 11; *Haven v. Haven,* 64 N. E. (Mass.) 410.

It is also contended that the statute of frauds is a bar to the right of recovery by the plaintiffs. Mr. Pomeroy, in discussing the subject of specific performance of parol contracts, recognizes the general rule that payments in money is not a part performance because the remedy at law is adequate for its recovery and there has been no irrevocable change of position, but in discussing the question of whether personal services is a sufficient act of part performance to take the case out of the statute said: "Where the consideration is paid, not in the form of money, but in the form of personal services of a character such that they do not readily admit of a pecuniary estimate or recompense, shall this be considered an act of part

performance? On this question the American jurisdictions are very evenly divided; the answer must depend on the theory which is adopted as the basis of the whole doctrine. On the first theory stated in a former paragraph, payment in services no more points to a contract concerning specific land than does payment in money; in fact, in the ordinary case—domestic services by a relative or by an adopted child—the fact of the services rendered gives rise to no inference of any contract whatever. On the other hand, if equitable fraud be taken as the basis of the doctrine, and the impossibility of restoring the complainant to the situation in which he was before the contract was made, the rendering of services, for a long term of years, the value of which can not be estimated by any pecuniary standard, must be considered an act of part performance of the highest character; the fraud upon the complainant is often greater than that resulting from either the taking of possession or the making of improvements. The promise, in these cases, has nearly always been to make a will devising lands to plaintiff; the services rendered, the care of an aged or invalid relative, often coupled with an abandonment of the plaintiff's previous home or occupation; or, in a large group of cases, the entire change of situation resulting from a virtual adoption of the plaintiff, when a minor, into the promisor's family, and the discharge of the domestic duties and obligations of affection flowing from such relation."

The learned author cites the authorities on both sides of the question, but we do not deem it necessary to enter into a discussion of them here for the reason that our court has adopted the latter theory. In the case of *Hinkle* v. *Hinkle*, 55 Ark. 583, Mr. Justice HEMINGWAY, in discussing the question, said:

"But the defendant pleads the statute of frauds, and the question is, if the statute applies, whether there has been such performance as to take the case out of its operation. Martin did everything he agreed to do. He gave up his employment, changed his residence, assisted in caring for his mother and in managing and conducting the business, moved upon the land and expended money in improving it. If the statute could defeat his claim, it would become a means of

fraud, not of its prevention. He did more than pay for, move on, and improve the land; he surrendered his employment and changed his home and avocation, and no return of the money expended would compensate him for annulling the contract."

What was said in that case applies with equal force here. The parol contract under consideration was not only mutual but was definite and certain, both in its terms and as to its subject-matter. It was clearly proved, and the services performed were referable to the contract alone, and were done for the purpose of carrying it into effect. Chas. Asbury was a young man, and had a good position in Indiana when the contract was entered into. He did not wish to leave that State and come to Arkansas. In pursuance of the contract between Jacob Fred and his wife and himself, he left that State and came to Arkansas with Jacob Fred. He and his wife provided a home for Fred, and nursed and cared for him during the remainder of his life. Although Fred was a cripple and an invalid during all this time, they tenderly nursed and cared for him and provided him with all the comforts they were able to furnish. Their testimony, both in regard to the terms of the contract and the services they performed in carrying it out, is clear and explicit, and is corroborated by the testimony of their neighbors, as well as by the testimony of some of the relatives of Jacob Fred. It is not contradicted in any material point by any witness. They assumed a peculiar and personal relation to Jacob Fred, and, according to their testimony, which is not disputed, rendered him services of such character that it is practically impossible to ascertain their value by any pecuniary standard. By entering into the contract with Jacob Fred, they changed the whole course of their life and devoted themselves to making his last days comfortable and pleasant, and, as said in the Hinkle case, if the statute could defeat their claim, it would become a means of fraud, and not of its prevention.

The decree will be affirmed.