OFFORD *v.* AGNEW.

4-8827                                           218 S. W. 2d 370

Opinion delivered March 21, 1949.

*E. R. Parham* and *Alston Jennings,* for appellant.

*Byron Bogard* and *Digby & Tanner,* for appellee.

MINOR W. MILLWEE, Justice. Nancy Meadows was the owner of three parcels of real estate in North Little

Rock, Arkansas, at the time of her death intestate on September 3, 1947. She resided on one of the lots and rented dwelling houses located on the others. Appellant, Albert Offord, is a half-brother and sole heir at law of Nancy Meadows, deceased. He resided in Chicago, Illinois, for several years prior to his sister's death. Appellee, Emma Agnew, is a sister-in-law of Nancy Meadows, deceased, being a sister of Joe Meadows, Nancy's husband, who died in 1942.

Appellee brought this suit against appellant for specific performance of an alleged oral contract between appellee and Nancy Meadows, deceased, whereby the latter agreed to execute a will leaving all her property at her death to appellee. Appellant's answer denied the allegations of the complaint.

By its decree the trial court found that a valid oral contract to execute a will was made; that it was fully performed by appellee; and that title to the three lots should be divested out of appellant and vested in appellee.

Appellee sought to establish the oral contract relied upon by the testimony of herself and several friends and neighbors of Nancy Meadows, deceased. Appellee lived with Joe Meadows and the deceased, Nancy Meadows, in North Little Rock at different times prior to Joe Meadows' death in 1942 and continued to live with Nancy Meadows until 1945 when she moved to Kansas City, Missouri.

Appellee testified that about two months after the death of Joe Meadows she and Nancy had the oral agreement relied upon. Her testimony as to the contract is as follows: "Q. Tell the Court some of the circumstances about this agreement you speak about. A. She said, 'You have been so nice to me and have always cared for me and helped me with my bills, and I think more of you than anybody and I make an agreement with you you have everything at my death—just like it stands.' Q. What did you say about it? A. I told her I would accept the agreement. . . .

"Q. It was within two months from Joe's death— that was her husband—she had this conversation in which she said she would leave you all this property? A. That is right. Q. How did she say she was going to leave it to you? She was going to give you a deed to it? A. Said she would give me a deed to it. Q. Said what? A. Said she would give me a deed to it. Q. Did she ever mention anything about a will? A. After we made the agreement she wrote and said she had made the will and everything was fixed and that was the letter I burned."

She also testified that she visited Nancy in North Little Rock in April, 1947, and that it was after this visit that deceased wrote her that the will had been made. Appellee introduced a letter written to her by Nancy on July 13, 1947, in which the latter sought appellee's advice concerning difficulties she was having with tenants and asked for money to pay fire insurance premiums on her properties. This letter contained the following postscript: "Sister, all these people say where is Emma that she don't help you out and knowing too that you are sick and are not to be bothered like this. She had no right to go off and leave you. That's what everybody is saying, white and colored, and knowing too that she is to get everything you got when she dies. She will be here then. So if you can, please do so and do it at once, please. Mrs. Dees says hello to you and please come home."

In response to this letter appellee stated that she visited deceased and paid a part of the insurance premiums. Appellee also stated that deceased had advised that appellee move with her husband to Kansas City, but later wanted her to move back to North Little Rock. Witness did not do this, but would send her money and came to North Little Rock to see her two or three times a year after she moved to Kansas City.

Several friends and neighbors of Nancy Meadows testified of the friendship that existed between appellee and deceased and that Nancy was not on friendly terms with the appellant. They related conversations with the deceased in which she expressed her affection for ap-

pellee and her desire that appellee have her property at her death.

Nancy Meadow's physician testified that he treated her for diabetes for a number of years prior to her death and on several occasions she said she wanted appellee to have her property and was going to see that appellee took care of the doctor bill. He treated Nancy in her home two or three times a month when she was unable to come to the office for such treatments, but had not seen appellee there in recent years. On cross-examination the doctor testified that deceased also talked about making a will of part of the property to him and stated that she was afraid she might become an invalid and would have to give or will her property to someone to take care of her.

Nancy Meadows frequently sought advice from her grocer who stated that deceased talked to him after her husband died in 1942 about making a will of her property to appellee. He suggested the name of a lawyer to draft the will and Nancy later told him that she had made the will. There is no proof that a will was executed. Appellee paid small grocery bills for Nancy, but most of these were incurred during the last illness of appellee's brother, Joe Meadows, in 1942.

A tenant who had lived in one of deceased's rent houses for nine years stated that a few days prior to her death deceased told her that appellee had been worrying her about making a will to the property, but that she was not going to do so because she might have to will it to someone else to take care of her. Another neighbor testified to a similar conversation with deceased.

The only issue on this appeal is the sufficiency of the evidence to support the decree finding that a valid oral contract was established and performed by appellee. The rule to be applied in testing the sufficiency of the evidence to support such a contract was restated in the recent case of *Crowell* v. *Parks,* 209 Ark. 803, 193 S. W. 2d 483, where our former cases were reviewed and we said: "It has long been the rule in this court that a valid oral contract to make a will or a deed to land may

be made, but that the testimony to establish such a contract must be clear, cogent, satisfactory and convincing. One of the latest cases so holding is *Jensen* v. *Housley, Admr.*, 207 Ark 742, 182 S. W. 2d 758, where a number of our former cases are cited. Among the cases so cited is *Kranz* v. *Kranz*, 203 Ark. 1147, 158 S. W. 2d 926, in which we said, 'it is not sufficient that he establish it (the oral contract) by a preponderance of the testimony, but that he must go further and establish the contract by evidence so clear, satisfactory and convincing as to be substantially beyond a reasonable doubt.' ''

It was further said in the Crowell case: ''In most of the cases, if not all of them, sustaining oral contracts to devise or convey lands upon performance of the consideration therefor, the plaintiffs have performed usually at sacrifices to themselves and performed services not easily compensated in money. For instance in our case of *Hinkle* v. *Hinkle,* 55 Ark. 583, 18 S. W. 1049, the plaintiff gave up his residence and employment in Louisville, Ky., moved to Van Buren, cared for his mother, managed the business, etc. See, also, *Fred* v. *Asbury,* 105 Ark. 494, 152 S. W. 155, and *Speck* v. *Dodson,* 178 Ark. 549, 11 S. W. 2d 456. In *Williams* v. *Williams,* 128 Ark. 1, 193 S. W. 82, it was said that the evidence 'clearly establishes the fact that plaintiff went to live with his uncle under an agreement that the latter was to convey the property to him in consideration of the care and attention to be bestowed during the latter's lifetime, and that plaintiff occupied the premises pursuant to that agreement and made substantial improvements,' and further said, 'In order to assume the obligations imposed upon him by the contract, he made an entire change in his surroundings and changed his occupation and place of residence.' In the Speck-Dodson case, similar facts were shown relative to plaintiff's change of residence and occupation.''

It is noted that in our former cases the promisee, as a consideration for the agreement of the promisor to convey or devise lands, has agreed to render services or perform acts in the future. In other words the agreement to make a will is supported by a prospective rather

than a past consideration. As in other contracts, a promise to make a will cannot be enforced without consideration. The usual type of consideration in contracts of this class is a promise by one party to support and care for another during life in consideration of the other party's agreement to devise the land. If we accept appellee's version of the terms of the contract in the instant case, the deceased agreed to convey or devise the property to appellee in consideration of services that had already been performed by appellee and the latter was under no obligation to render future services. According to appellee, this agreement was made in 1942 soon after the death of her brother, Joe Meadows. The evidence is somewhat vague and uncertain as to the nature and extent of the servcies that had been performed by appellee at that time. She had lived with her brother and Nancy, assisted in the last illness of her brother and paid a few grocery bills incurred by the parties. These acts had been performed without reference to any contract and apparently were motivated as much by appellee's love for her brother as by her friendship for his wife. We hold the evidence here insufficient, under the strict rule heretofore announced, to establish a contract supported by a valid consideration.

If it be assumed, however, that appellee agreed to render future services to her sister-in-law, the evidence is lacking in that clarity and certainty required to establish substantial performance on her part. While appellee and her witnesses testified in general terms that appellee helped, cared for, sent money to, and paid bills for deceased after the making of the alleged contract, there is little evidence of specific acts to support these statements. Nancy resided in one of her houses where she kept roomers and lived off the income of her two rent houses. At times she would become bedfast on account of diabetes and was waited on by neighbors who testified that they never saw appellee present on such occasions after she moved to Kansas City. Appellee visited deceased occasionally and testified that she sent her money, but specific occasions or amounts are not shown. She paid a grocery bill of deceased for $5.17 and made a part

payment on fire insurance premiums on one of her visits. Deceased apparently paid her own doctor bills and her physician and grocer both filed claims against her estate.

While the testimony shows that Nancy Meadows intended, at least for a time, to make a will of her property to appellee, we are concerned here with the question whether she made a valid contract to do so, and whether appellee performed her part of the contract. Our conclusion is that the testimony does not measure up to that degree of certainty and definiteness which the law requires.

The decree is, therefore, reversed and the cause remanded with directions to dismiss the complaint.