JEFFRIES v. MERIDETH.

4-9631 243 S. W. 2d 942

Opinion delivered December 10, 1951.

*John B. Driver,* for appellant.

*Ben B. Williamson,* for appellee.

GRIFFIN SMITH, Chief Justice. John Wesley Jeffries died intestate in February, 1946, leaving miscellaneous household effects estimated to be worth slightly less than

$375 and a home on four and a half acres of land appraised at $600. He was survived by five daughters and three sons. One of the sons, Floyd, is the appellant here and his sister, Delia Merideth, is appellee. These values were set out in an affidavit filed by Floyd Jeffries in Probate court, Ark. Stat's, § 62-2127. In the affidavit it was stated that there were no estate debts other than a hospital bill for which the affiant had assumed personal responsibility. Floyd acquired all outstanding interests except that of Delia.

Delia Merideth filed in the Chancery court what was termed an answer and cross-complaint, although at that time the administration was in Probate court. This irregularity was subsequently corrected by stipulation. Delia denied that Floyd had any interest in the property. On the contrary she alleged equitable ownership because of a contract entered into when her father communicated with her at Dayton, Ohio, where she lived with her husband. Both were working at the time Delia's father asked her to come to the little community of Pleasant Grove, Ark., and give personal services in return for the property. It is not clear whether the promise made by Wesley Jeffries to his daughter was oral or through letter. On direct examination the questions and answers are such as to leave the impression that the promise was made after Delia and her husband reached Pleasant Grove, but on redirect examination there was an affirmative answer to the question directed to Delia, "And you left your jobs to come here and take care of your father and stepmother, . . . relying on his statement that you could have the property." There is no suggestion that father and daughter communicated by telephone, nor was there an objection to the question as asked. The rule requiring that testimony necessary to establish a parol contract to convey land must be clear, cogent, satisfactory and convincing was stated in *Crowell* v. *Parks,* 209 Ark. 803, 193 S. W. 2d 483.

Appellant testified that before entering the armed forces of World War II he owned a team of horses worth $200, two cows, five or six hundred bushels of corn, two

hogs, some oats, and perhaps some incidental feedstuff. His father sold the team for $140, then bought it back, and one horse died. The live horse was returned to appellant. However, throughout his testimony appellant insisted that he had the army authorities deduct $50 per month from his salary. This, he said, was sent to his father for a period "close to three years." Because his father had always been a renter Floyd felt that the time was opportune to acquire a home "for them," but he stoutly maintained that the money was not an allotment. On cross-examination Floyd admitted that he was making his father a gift.

A small place on Dodd Mountain was first purchased, but Floyd's father wrote that he wanted to sell it and buy another, to which no objection was made. The homesite embracing the four and a half acres now in question appears to have been purchased at least in part with money realized from sale of the Dodd Mountain property. But Floyd did not assert that there was an agreement regarding ownership. Rather, his statement was that the old gentleman wanted to buy a place and he (Floyd) told him it could be done now. Question: "Did you and your father decide jointly upon a place to buy?" A. "No. He always wanted a place on top of Dodd Mountain and when I was in the army he wrote [to that effect, and I replied] 'Buy that place on top of Dodd Mountain.'" The father decided he wanted to sell, and that was agreed to. Appellant was positive his father told him on several occasions that the second place was *his.*

A brother who claimed to have seen his father open Floyd's letters testified that sometimes Floyd would send $75 a month and occasionally a twenty-dollar bill would be included in addition to the $75—"making $90 or $95 a month."

The trial court no doubt thought this testimony—contradicting appellant—was too improbable for belief. All reasonable inferences to be drawn from Floyd's testimony are that the deductions were made from his government pay and sent direct, hence the improbability that

the government paymaster would include $20 bills for Floyd's accommodation.

The only contradiction of Delia's claim that her father promised to leave her the property in return for services comes from witnesses who say they heard Wesley remark on several occasions that the place was Floyd's or that it would be Floyd's. But there is testimony that Wesley asked Fred Merideth (Delia's father-in-law) to write and ask Delia and her husband to come and help around the place. Wesley's wife (Delia's stepmother) was ill. The day Delia arrived Mrs. Jeffries suffered a paralytic stroke and thereafter was not able to leave her bed. Fred Merideth's explanation was that immediately after Delia and her husband arrived by car from Ohio he (Fred) talked with Wesley, who said he was going to make Delia and her husband a deed to the place.

There can be little doubt that Delia rendered valuable services. She responded to her father's request early in 1946 and from the day following her arrival until her stepmother died in August, 1948, administered to her and looked after the household affairs. Lloyd, Delia's husband, was also there, and while there is testimony that he habitually drank and that he was more of a nuisance than a benefit, yet others testified to the contrary. One of the brothers, in purely opinion testimony not objected to, said he thought Delia would be entitled to the homesite but for her husband's conduct.

We are not dealing with Lloyd's legal status. He does not claim the place or any interest in it. Delia cared for her father until his death early in 1949. Appellant admits that his father repaid $500 of the money sent from army checks, and he used this as part of a $1,500 payment on a $2,000 farm he bought. Appellant's father lived five years after appellant's services with the armed forces had terminated, yet during that period nothing was done to impress the property with the trust he now seeks to establish. Certainly Floyd's own statement that the money he sent his father was a gift destroys any theory of trusteeship, leaving only a naked hope upon

appellant's part that his father would remember him by deed or will.

We have held that performance such as Delia has established in the instant case removes the transaction from the statute of frauds. *Fred* v. *Asbury*, 105 Ark. 494, 153 S. W. 155. Mr. Justice HART, who wrote the Fred-Asbury opinion, remarked that the parol contract was definite and certain, both in terms and as to the subject-matter, and that it had been clearly proved. When consideration is given appellant's statement that the money sent to his father was a gift and not a loan, the remaining question is whether Delia was truthful regarding her father's promise.

Our conclusion is that Floyd disproved his own attempt to establish a trust; and, having waited until his father had passed away, he must abide the facts of his sister's abandonment of employment in Ohio, her long period of services to stepmother and father, the unequivocal assertion of the contract, and the attending circumstances that inferentially lend credence.

Affirmed.