ALPHIN, EXCR. *v.* ALPHIN.

5-694                                                       279 S. W. 2d 822

Opinion delivered May 30, 1955.

[Rehearing denied June 27, 1955.]

*J. S. Brooks, Spencer & Spencer* and *Wright, Harrison, Lindsey & Upton,* for appellants.

*L. B. Smead, Robert C. Compton* and *Walter L. Brown,* for appellees.

MINOR W. MILLWEE, Justice. Appellee, J. Hendricks Alphin, brought this suit against appellant, Sam D. Alphin, individually and as executor of the last will of James A. Alphin, deceased, seeking specific performance of an alleged oral contract between appellee and the said James A. Alphin whereby the latter agreed to execute a will leaving to appellee one-half of the property received by James A. from his father J. S. Alphin, who was also the father of appellee and appellant. In the decree appealed from, the chancellor found that a valid oral contract was made and a will executed pursuant thereto; and that appellee was entitled to specific performance of the contract which had been fully performed on his part.

Appellee is the son of J. S. Alphin by his first wife who died in 1909. Sam D. and James A. Alphin are the sons of J. S. Alphin by a second marriage to Mary Armstrong who died in 1929 leaving a sizable separate estate to her two sons. The three sons are the sole heirs of J. S. Alphin who died in 1943. Appellee is 28 years older than appellant and 30 years older than James A. who died suddenly of polio in 1952.

J. S. Alphin was a successful businessman in El Dorado, Arkansas, for many years and owned considerable real property in and around that city. Because of his age and poor state of health he transferred all his property to his three sons by gift deed in 1937. Although appellee and appellant had previously been made trustees of the estate, appellant and James executed power of attorney to appellee who assumed the primary responsibility of managing and directing the estate which was left intact and operated under the name of "Alphin Properties." At the time of the transfer J. S. Alphin was indebted to appellee in the sum of approximately $41,000 and owed the other two sons jointly about $50,000. There was other indebtedness of about $12,500 against properties

valued at more than $400,000. The loan by appellee was from funds realized from an investment in oil producing land and the joint loan by the other two sons was from funds inherited from their mother. Appellee also inherited from his mother a block in the city of El Dorado which he deeded to his father in 1912. This block subsequently became the most valuable single tract of Alphin Properties. In discharging the family indebtedness appellee was paid interest on his loan to his father but no interest was paid to Sam and James on their loan.

Appellant and James were in school and military service much of the time from 1937 to 1945. During this period appellee had exclusive management of Alphin Properties for the three owners and also directed management of the household of their father until his death in 1943. Sam married and after 1945 lived in El Dorado and assisted in the operation of the properties. In addition he was interested in the ownership and operation of a cold storage plant and a well drilling outfit. After his discharge from the military service James continued in school for a time. In the spring of 1948 he and appellant became the owners of a soft drink bottling company in Monterrey, Mexico, where James spent most of the time in managing and operating the plant until his death in 1952. He was never married.

In operating Alphin Properties appellee disposed of approximately 5,000 acres of rural lands and reinvested the proceeds in business and residential properties in El Dorado. The residential units were then sold and more business buildings constructed, and the subsequent operation of the properties consisted primarily of collection of rentals and sale of oil and gas leases on the rural lands, the minerals under which had been reserved.

Alphin Properties maintained offices in El Dorado at all times after 1937 and had regular employees who collected rentals and kept the books and records of the business. These employees also kept appellee's personal books without pay from him and he transacted his personal business from the offices rent free. The office

phone was listed in his name but paid for by Alphin Properties. In addition to management of the properties appellee was local manager of Anderson Clayton Cotton Company until 1945 at a salary of $500 per month. He was also vice-president of an oil company and director of a bank. He also spent from 3 to 6 months each year from 1938 to 1951 in New Mexico in the management and operation of his 48,000-acre cattle ranch. He was active in state and local politics every two years and would postpone his trips to New Mexico until after the second primary election. He would occasionally return to El Dorado to look after some business of Alphin Properties but the expenses of these trips were paid out of personal funds. At the time of the trial Alphin Properties had a value in excess of a million dollars.

James A. Alphin made three wills. The first was executed in March, 1948, in which the bulk of his estate was left to appellant. The second was made April 14, 1948, in which, after specific bequests to relatives and churches, the Armstrong estate properties inherited by James from his mother were left to Sam and the residual estate was divided equally between Sam and appellee. The third will was made in February, 1950, in Monterrey, Mexico. After specific bequests similar to those in the second will, including a bequest of $1,000 to appellee, the bulk of the estate was left to appellant as in the first will.

After the death of James in June, 1952, the 1950 will was offered for probate in August, 1952. Appellee first filed a petition in the Union Probate Court on December 15, 1952, contesting probation of the will. No hearing was ever held on the petition which was dismissed following the decree in the instant case. In the latter part of 1953 appellee filed suit in the Union Circuit Court, Second Division, to enforce the alleged oral contract to make a will. The filing in circuit court was apparently by mistake and there was a transfer to Union Chancery Court, Second Division, and a subsequent voluntary dismissal in that court. The instant suit was then filed in the first division of Union Chancery Court on February 25, 1954.

It is undisputed that there was never any agreement or claim for compensation of any kind by appellee for services rendered in connection with his management of Alphin Properties prior to April, 1948. It is also admitted that appellee never sought nor expected compensation for services to Sam which were practically identical to those rendered to James. The instant suit is based on an alleged agreement between appellee and James shortly prior to the making of the second will on April 14, 1948. Appellee was permitted to testify, over appellant's objections, that he had several conversations with James at that time when only the two were present; that James told him of violent quarrels with Sam because the latter charged him room and board; that Sam had "high-pressured" him into making the March will; and that when appellee expressed a desire to get away from their quarrels and suggested a division of the Alphin Properties by arbitration, James said: "I will tell you what I will do, I need you here. While I love Sam dearly, I don't want to turn my part of the business over to him, and I am gone away from here quite a bit; I will will you half of the stuff that comes from papa if you will stay on and look after this business." Appellee agreed and a few days later James handed him a copy of the April, 1948, will on the streets of El Dorado in the presence of Judge Gus W. Jones.

In corroboration of appellee's testimony he offered the testimony of several close personal, political and business friends relative to the splendid manner in which he had managed Alphin Properties and concerning the actual execution and delivery of the April, 1948, will; also some general discussion of family arguments and a possible division of the estate about the time the will was executed. Only two of these witnesses gave any testimony bearing directly upon the making of the alleged oral contract. S. B. McCall, El Dorado postmaster and lifelong personal and political friend and associate of appellee, testified that he had a casual conversation with James in the lobby of the post office in the spring of 1948 in which the latter told him about making the will to

appellee because he had looked after and agreed to continue to look after the estate and hold it together. Witness described James as a distant and peculiar person who had little to say to anybody. He could not remember the substance of any other conversation with James and never mentioned the one in question to appellee or anyone else until he told it to appellee's attorney after the instant suit was brought. Mr. McCall experienced difficulty recalling some of the exact provisions of the oral agreement.

Bruce Bennett testified that he and another person, now deceased, went to appellee's office in the spring or summer of 1948 seeking appellee's political help in obtaining certain jobs, Bennett being interested in an appointment as deputy prosecuting attorney. Sam and James were in the office but Sam left and "the atmosphere was charged." When Bennett asked what was wrong, James said: "I have made a will leaving one-half of papa's property that I inherited to Big Brother and I have left the other half to Sam." Bennett then asked what was wrong with that and James replied: "I don't know." James then said he wanted appellee to continue taking care of the properties and had made a will under the agreement as related by appellee. Bennett attended summer school at Vanderbilt University in 1948. While he was on friendly terms with each of the Alphin brothers he admitted that he tried several times to persuade appellant to talk with counsel for appellee about probating the April, 1948, will. Appellee was a close friend and made loans and a donation to witness in his successful campaign for prosecuting attorney. He admitted having a conversation with appellant in Little Rock when Burney Dumas was present but denied their testimony to the effect that he then stated that appellee was his friend and he would testify to whatever was necessary to help him.

Opposed to the foregoing is the testimony of appellant, his wife and several other close personal and business friends of James. The effect of their testimony is that the close brotherly relation and association existing

at all times between Sam and James never existed between the latter and appellee; that appellee became very angry when he learned of the March, 1948, will and threatened to have a bank loan by James called unless he changed the will which he was forced to do but with the intention to again change it in accordance with his own wishes as expressed in the 1950 will; and that James never at any time mentioned any agreement or contract with appellee to make a will to any of said witnesses. Medlock Harbison was a close friend of James and his constant companion for about 4 years in the operation of the bottling company in Mexico. He drafted and was named co-executor of the 1950 will which was in his possession when James died. He testified about ill feeling between appellee and James and the close relationship between the latter and Sam who was present when the 1950 will was made. James never said anything to Harbison about any agreement to make a will to appellee.

One reason advanced by appellee for James contracting to will his property to one who was 30 years his senior is that James was a "blue baby" and in poor health, but this was refuted by uncontradicted medical evidence and appellee admitted that James served in the armed forces for several years with distinction and apparently without any serious illness. In all fairness it may be said that many of the material witnesses on both sides made little effort to conceal their bias or interest in favor of the party for whom each was testifying.

We first consider the admissibility of the testimony of appellee regarding his conversations and transactions with James relative to the making of the alleged oral contract relied upon. We agree with appellant's contention that this testimony was inadmissible under Schedule II of the Arkansas Constitution, commonly called "The Dead Man's Statute." Appellee is here seeking judgment against the appellant as executor for both real and personal property of the estate. In his answer appellant claimed all the personal property for the purpose of paying debts. His further assertion that it was necessary to use part of the real estate to pay debts is denied by

appellee. An almost identical situation was presented in *Jensen* v. *Housley,* 207 Ark. 742, 182 S. W. 2d 758. After holding that the legal title to personal property of which a decedent died possessed vested in the administrator or executor upon his appointment, the court said: "Since a judgment against the administrator for the personal property of the deceased was prayed by appellant in her complaint, it is obvious that, regardless of the situation as to the real estate, the administrator was a necessary party to this suit and that it was an action in which the testimony of a party as to transactions with the decedent was declared incompetent under the provisions of § 5154 of Pope's Digest, *supra.* Therefore, appellant was not a competent witness to establish the contract relied upon by her." See, also, Page on Wills, § 1751.

Appellee relies upon certain decisions both prior and subsequent to the Jensen case in which it is insisted that testimony similar to that in the instant case was given, apparently without objection. The privilege of the statute is waived when testimony is introduced without objection. *Lisko* v. *Hicks,* 195 Ark. 705, 114 S. W. 2d 9. Moreover, the question of admissibility was not raised or decided in those cases and we adhere to our holding in the Jensen case which is controlling here.

The principal remaining issue is the sufficiency of the evidence to support the decree for specific performance with this testimony excluded. While a valid oral contract to make a will or deed to real estate may be made, it is well settled that the testimony to establish such contract must be clear, cogent, satisfactory and convincing. *Walk* v. *Barrett,* 177 Ark. 265, 6 S. W. 2d 310; *Kranz* v. *Kranz,* 203 Ark. 1147, 158 S. W. 2d 926. In most all the cases sustaining oral contracts to devise or convey lands upon performance of the consideration therefor, the plaintiffs have performed usually at sacrifices to themselves and performed services not easily compensated in money. *Crowell* v. *Parks,* 209 Ark. 803, 193 S. W. 2d 483. Another generally accepted rule is stated in 69 A. L. R. 133, as follows: "It seems that in order for

part performance to operate to take a contract of the kind under consideration out of the operation of the Statute of Frauds, the services must be exceptional and extraordinary in character, or it must appear that the promisee's whole course of life was changed by performance of the contract. A change in the status of the promisee, or the assumption of a relation with the promisor different from that theretofore existing or which would ordinarily exist in the absence of a contract, is very highly regarded by the courts as evidence of an alleged oral contract to devise or bequeath property." The usual type of consideration is a promise by one party to change his place of abode and support and care for another during life in consideration of the party's agreement to devise the property. *Fred* v. *Asbury*, 105 Ark. 494, 152 S. W. 155; *Offord* v. *Agnew*, 214 Ark. 822, 218 S. W. 2d 370.

It seems doubtful there was any change in the *status quo* of appellee in the instant case. It is also questionable whether his services were so exceptional as not to be subject to pecuniary estimate as to value. However, it is unnecessary to determine such questions. When the testimony of appellee concerning the transactions and conversations with decedent about the alleged contract is excluded, it is our opinion that the competent evidence does not measure up to that high standard of clarity and certainty which the law requires. The decree is accordingly reversed and the cause remanded with directions to dismiss the complaint.

SEAMSTER, C. J., and ROBINSON, J., dissent.

ROBINSON, J., dissenting. In my opinion, the evidence, independent of Hendricks Alphin's testimony as to the transaction with James Alphin, is clear and convincing that James Alphin made a contract with his half-brother, Hendricks, whereby James would will to Hendricks one-half of the property James owned which came from their father.

In the first place, it is not unreasonable that James would enter into such a contract. Hendricks Alphin in-

herited from his mother the most valuable portion of the property involved in this litigation. He deeded this property to his father without any consideration whatever. Also, it is shown by the testimony of J. K. Mahoney, who had married the sister of Sam Alphin's wife and who was thoroughly familiar with the Alphin properties, that all of the property would have been lost if it had not been for the good management of Hendricks Alphin.

S. B. (Pete) McCall, who has been postmaster of El Dorado for 19 years, testified that James Alphin told him that he (James) was gone from El Dorado a large part of the time and that Hendricks had made a good job of looking after the Alphin properties; that he wanted Hendricks to continue to look after the properties and had therefore willed to Hendricks one-half of his interests in the property that came from their father.

Bruce Bennett, a well-known lawyer in El Dorado and Prosecuting Attorney for the 13th Judicial District, testified that in a conversation with James Alphin, James stated: ''I have made a will, leaving one-half of Papa's property that I inherited, to 'big brother'; and I have left the other half to Sam . . . 'Big brother' has been taking care of this property for years, and I want him to continue to take care of that property, and I have made a will, under an agreement whereby Big Brother will keep taking care of the property, and I will leave him one-half of what I inherited from Papa, and Sam will get the other half.'' Bennett's testimony is plain and unequivocal. It is clear and convincing.

Gus W. Jones is Judge of the First Division Circuit Court in El Dorado, and has been Judge in that community for 26 years. He knows Hendricks Alphin and knew James Alphin in his lifetime. He knows that a disagreement arose between James Alphin and Hendricks Alphin because James had made a will leaving all of his interests in the J. S. Alphin properties to Sam Alphin, and that they settled their differences and made an agreement that was satisfactory to both of them. James

Alphin told Judge Jones that he had made a will in the office of Mahoney & Yocum whereby he had willed his interests in the Alphin properties half to Hendricks and half to Sam. In the presence of Judge Jones, James exhibited a copy of the will to Hendricks.

It is not disputed that James did make such a will in the office of Mahoney & Yocum. It is shown by Judge Jones that, in his presence, James exhibited this will to Hendricks. There can be no reasonable explanation of James exhibiting the will to Hendricks except the fact that he was proving to Hendricks that he had carried out his agreement. It is a matter of common knowledge that a person does not ordinarily go around exhibiting his will to the beneficiaries. Sam was also one of the beneficiaries named in the will, and there is no evidence that James exhibited the will to him. James was showing Hendricks that he had carried out the agreement. In fact, it is practically conceded in this case that for a consideration James did enter into an agreement with Hendricks whereby James would will part of the property to Hendricks, but appellant Sam Alphin contends that James agreed to do so in consideration of certain credit arrangements.

Disregarding the testimony of Hendricks entirely, the testimony of Judge Jones, Bruce Bennett and Pete McCall is convincing. This evidence, coupled with the fact that James actually executed the will, leaving part of the property to Hendricks, and exhibited such will to Hendricks in the presence of Judge Jones, proves conclusively in my opinion that there was an agreement between Hendricks and James that, in consideration of Hendricks' continuing to look after the property, James would leave to Hendricks part of the property which came to James from their father.

I am thoroughly convinced that the Chancellor's decree is correct and that it should be affirmed.

SEAMSTER, C. J., joins in this dissent.