102 So.2d 165 (1958)
Dorothy V. TRAURIG, a single person, Appellant,
v.
Simeon SPEAR, as executor of the estate of Abraham Bloom, deceased, Appellee.
No. 57-155.
District Court of Appeal of Florida. Third District.
April 8, 1958.
Rehearing Denied May 5, 1958.
*166 Redfearn, Ferrell & Simon, Miami, for appellant.
Sibley, Grusmark, Barkdull & King, Miami Beach, for appellee.
CARROLL, CHAS., Chief Judge.
Appellant brought an action in the Circuit Court of Dade County against the executor of the estate of the deceased Abraham Bloom. On the trial a verdict was directed for the defendant at the close of the plaintiff's case. There was involved an alleged contract between the plaintiff and Bloom, for him to make provision for plaintiff in a will, to compensate for services rendered.
The question to be determined on this appeal is whether the evidence, viewed in the light most favorable to the plaintiff, was sufficient to establish existence of the contract.
The appellant Dorothy V. Traurig alleged that in the fall of 1937, while she was living in New York City, Abraham Bloom asked her to come to Miami Beach and operate an apartment hotel which he owned.
In paragraph two of her complaint, the plaintiff alleged the contract as follows:
"A short time prior to the month of October 1937, Abraham Bloom, the decedent, requested of the plaintiff that if she would leave her home in New York and come to Miami Beach and perform services requested by him from time to time that she would be paid for said services when he died, by a provision in his will to that effect. The plaintiff relied on such promise, left her home in New York and came to Miami Beach and performed the services requested by Abraham Bloom, from time to time, from October 1937 to the date of the sudden death of Abraham Bloom on January 8, 1956. Plaintiff has never been paid for said services and the said Abraham Bloom made no provision in his said will for the payment to the plaintiff for said *167 services, as he promised plaintiff would be included in his will."
The plaintiff further alleged that she was a niece of Bertha Bloom, the then wife of Abraham Bloom; that the Blooms resided in Miami Beach; that Mr. Bloom operated a men's wear store in Miami; that he was the owner of an apartment hotel on Miami Beach, which was completed in October of 1937; that the plaintiff moved to Florida from New York and managed and operated the apartment hotel for Abraham Bloom from October 1937 until October 1939; that she continued to perform services for the Blooms in connection with the apartment hotel and otherwise until the death of her aunt, Bertha Bloom, in 1943; and that certain additional services were performed by her for Mr. Bloom until he died in 1956. In her complaint the plaintiff placed a value of $18,000 on her services, and sought judgment in that amount.
The defendant executor answered, denying the allegations relating to the contract and the performance of services thereunder.
The record reveals that the plaintiff's mother moved from New York to Miami in October of 1939, and that plaintiff then moved out of the Bloom's apartment hotel and resided thereafter with her mother.
The plaintiff alleged that no salary as such was paid to her for services in operating the hotel or for any other services performed for the deceased, and the record is silent as to whether her needs for support and maintenance during the period she managed the apartment hotel were supplied out of the monies received in that business.
Beginning in 1941 plaintiff accepted employment from the City of Miami Beach, and she worked thereafter in various capacities at the city hall.
Abraham Bloom's wife, Bertha Bloom, died in 1943. Several years later Abraham Bloom married one Ethel Mitchell, who became his widow upon his death in 1956. In his will Abraham Bloom made no provision for plaintiff, and left his property to his wife Ethel.
Cases such as this, which represent a claim that a decedent made a given contract to dispose of his estate at death in a different manner than he attempted to do by his will, have resulted in the formulation of a positive rule which must govern their determination. While such contracts are recognized as valid and enforceable (Exchange National Bank of Tampa v. Bryan, 122 Fla. 479, 165 So. 685, 686; First Atlantic National Bank v. Cobbett, Fla. 1955, 82 So.2d 870, 871), the proof thereof must be clear, cogent and convincing, and the making of such oral contracts or agreements must be established by disinterested witnesses.
As said by the Supreme Court in this connection, in Simpson v. Ivey, Fla. 1953, 67 So.2d 687, 689:
"Standing alone the will of John Canfield left his property to his wife, Mary Adams Canfield, in fee simple and without any strings or limitations attached to it.
"The burden of proof was upon the appellants and in order to overcome the will as written, executed and probated under an alleged oral contract, it was necessary that the appellants establish such oral contract by clear and convincing testimony. See Miller v. Carr, 137 Fla. 114, 188 So. 103; First National Bank & Trust Co. v. Falligant, 208 Ga. 479, 67 S.E.2d 473."
The requirement for strong evidence and positive proof of such contracts has been a matter of unvarying insistence by the courts. Exchange National Bank of Tampa v. Bryan, supra; Miller v. Carr, 137 Fla. 114, 188 So. 103; Simpson v. Ivey, supra; First Atlantic National Bank v. Cobbett, supra; Alphin v. Alphin, 225 Ark. 122, 279 S.W.2d 822; Johnson v. Flatness, 70 Idaho 37, 211 P.2d 769; Wessel *168 v. Eilenberger, 2 Ill.2d 522, 119 N.E.2d 207; Finn v. Finn's Adm'r, Ky. 1951, 244 S.W.2d 435; Baesler v. Bell's Executrix, Ky. 1957, 299 S.W.2d 605; Hanson v. Urner, 206 Md. 324, 111 A.2d 649; Ehmke v. Hill, 236 Minn. 60, 51 N.W.2d 811; In re Boyd's Estate, Miss. 1956, 87 So.2d 902; Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 253 S.W.2d 116; Bealmear v. Beeson, Mo. App. 1957, 303 S.W.2d 690; Shook v. Woodard, 129 Mont. 519, 290 P.2d 750; Drew v. Hawley, 164 Neb. 141, 82 N.W.2d 4; Robertson v. Hackensack Trust Co., 1 N.J. 304, 63 A.2d 515; Stafford v. Reed, 363 Pa. 405, 70 A.2d 345; Cochran v. Bise, 197 Va. 483, 90 S.E.2d 178; Silhavy v. Doane, 1957, 50 Wash.2d 110, 309 P.2d 1047; Lantz v. Reed, W. Va. 1955, 89 S.E.2d 612.
The so-called "Dead Man's Statute" (§ 90.05, Fla. Stat., F.S.A.) is consistent with that rule, as to the degree of proof required. The purpose of the statute is to prevent the surviving party or parties from having the benefit of his or their own testimony, where, by reason of the death of the adversary his representative is deprived of the decedent's version of the transaction or statement. Accordingly, by that statute the testimony of the claimant is stilled when his adversary's "mouth is stopt with dust."
This brings us to a consideration of the evidence which was presented on behalf of the plaintiff to establish the claimed contract. Two witnesses were produced who were in the presence of the parties when her move to Florida was discussed. Three other witnesses testified to subsequent declarations against interest by Bloom. The two witnesses who testified as to the negotiations between the parties were Benjamin Finkle, plaintiff's brother-in-law, and his wife Rae Finkle, who was her sister.
In 1937 the plaintiff and the Finkles were living together, at the home of the plaintiff's mother in New York. The Blooms were residing in Miami Beach, but had spent some vacation time in New York. Benjamin Finkle's version of the matter was as follows:
"Q. Did you have a conversation with Abraham Bloom at that time in the presence of Dorothy and Mrs. Bloom? A. I didn't have any conversation, but I was there when the conversation was held between Mr. and Mrs. Bloom and my mother-in-law, Dorothy, and my wife. The conversation was that they were building an apartment hotel in Miami and weren't able to have anybody take care of it, and they asked whether Dorothy wouldn't come down and take care of the hotel and run it for them, and if she ran it for them, they would repay her in their will.
* * * * * *
"Q. What, if anything, did Dorothy say in regard to that conversation? A. Well, the first time Mr. and Mrs. Bloom were up to visit my mother-in-law on Sunday, she had a pretty good job, she said, and she wasn't sure whether she wanted to leave. So, she decided, and my mother-in-law decided they would give it a little thought. The following Sunday, Mr. and Mrs. Bloom came up to the house again and Dorothy had then decided she would come down and live with them and take care of their hotel, but what she had to do was give the people notice on her job that she was leaving."
That witness also testified as to certain later declarations by Mr. Bloom to the general effect that plaintiff had done a lot of things for him, and that he was going to "repay her well when he died."
Mrs. Finkle, the plaintiff's sister, referring to the same occasion of which her husband had testified, stated as follows:
"Q. Did you have occasion to see Abraham Bloom in New York at *169 your mother's home during the summer of 1937? A. Yes, I did.
"Q. Under what circumstances; what transpired? A. Mr. and Mrs. Bloom came up to the house while they were in New York, and they told us that they were building an apartment hotel in Miami Beach, and that they didn't think they could take care of the property themselves because they had a store in Miami, and since they liked Dorothy, and since she was single, they thought it would be a good idea for her to come down and live with them and take care of this apartment hotel for them, run it for them. They said if she would do that, they would give her anything she wants; they would treat her like a daughter, and that they would pay her well in their will when they died. She said she would consider it. She had a good job and she wasn't sure she wanted to leave it, and she would think about it."
She also testified that, in later years, "quite a few times he [Bloom] said she doesn't have to worry, that he will take care of her, and he will do the best he can for her; that she is wonderful and he wishes he had a daughter like that."
Lena Schindler was a sister of the plaintiff's mother and of Bertha Bloom. She testified to a subsequent declaration by the deceased, as follows:
"A. Well, I asked them what Dorothy was doing. He says, `Well, she is just like my child. What difference does it make?' He said, `She is staying with me and I will treat her just like a child.' He had no children, so he considered her one of his own."
Another witness was Wilmore Nottage. He had been employed at the apartment hotel until 1941. He related a subsequent declaration by the deceased, as follows:
"Q. While you were working there, did Abraham Bloom ever say anything to you about Dorothy in connection with her work in any way? A. Only that I know he said he would leave Miss Dorothy in his death will."
Irwin Spar testified to the effect that Mr. Bloom made many visits to the plaintiff where she worked in the city hall, requesting services of her at city hall such as obtaining information or straightening out matters relating to his properties. He also testified as to declarations on the subject of providing for the plaintiff's well-being, as follows:
"Q. Did you ever hear Mr. Bloom say anything in regard to Dorothy? A. I heard him mention on several occasions he would take care of her in his will.
"Q. When was it he made those statements and under what circumstances, and where, if you remember? A. I can recall one time at my desk. I can recall another time in the presence of our building department in front of Mr. Hancock, and I would say several times at my desk."
It is upon the testimony of Benjamin Finkle and his wife that the plaintiff must rely, to establish the existence of the contract upon which she declares. As related by the Finkles, the words purported to have been used by the deceased were not the language of contract or agreement. Not only did the supposed contract lack a recital of usual and essential terms, but the statements attributed to the deceased were susceptible of a construction that he did not intend to enter into a contract as charged by the plaintiff, but to take the plaintiff in as a member of the family and generally to care for her, coupled with a statement of intention to reward her well on his death, as he would some natural object of his bounty.
*170 Evidence which tends to establish nothing more than an intention to leave another an undetermined sum of money by a will is not evidence which will support an allegation of an express agreement or contract to do so. Contracts of the character in question are asserted with such frequency that courts have grown conservative as to the nature of the evidence required to establish them and for their enforcement. Such contracts are easily fabricated and hard to disprove, from the nature of the circumstances in which the claim to them arises.
We hold that the able trial judge was correct in his determination that the evidence in this case relating to the formation of a contract was insufficient under the rules of proof imposed by the law.
The testimony of the witnesses Schindler, Nottage and Spar, reciting declarations against interest made by the deceased during his lifetime, can not serve to supply the foundation and structure of a contract which the more direct testimony of the Finkles was incapable of proving. Because such testimony consists of repetition of oral statements peculiarly open to imperfections and mistakes or actual alterations, it is generally regarded as unreliable and of poor quality. The party who is said to have made the statement may not have clearly expressed his own meaning, or his statement may have been misunderstood or misinterpreted by the witness. Slight changes by the witness in repetition of a statement may give an effect to it grossly at variance with what a party actually said. The nature of such testimony lends itself to wilful falsity. But assuming the honesty of the witness, his memory may be at fault. His interest in the matter may, through prior discussion and thought, well result in detracting from accuracy in his repetition of such prior statements to him. Lea v. Polk County Copper Co., 21 How. 493, 16 L.Ed. 203; Purcell v. Coleman, 4 Wall. 513, 18 L.Ed. 435; Glenn Falls Indemnity Co. v. Golden, D.C.D.C., 148 F. Supp. 41; In re Estate of Emerson, 175 Cal. 724, 167 P. 149; Fugi v. Edwards, 96 Cal. App.2d 460, 215 P.2d 802; Fagan v. Fisher, 74 Colo. 473, 222 P. 647; Byers v. Byers, 242 Iowa 391, 46 N.W.2d 800; Succession of Rockwood, 231 La. 521, 91 So.2d 779; Sheardy v. Baker, 323 Mich. 364, 35 N.W.2d 283; Russell v. Sharp, 192 Mo. 270, 91 S.W. 134; Langston v. Currie, 95 Mont. 57, 26 P.2d 160; O'Neal v. First Trust Co. of York, 160 Neb. 469, 70 N.W.2d 466; Turro v. Turro, 38 N.J. Super. 535, 120 A.2d 52; Anderson v. Brown, 276 App.Div. 450, 95 N.Y.S.2d 711, amended 276 App.Div. 1057, 96 N.Y.S.2d 310, affirmed 302 N.Y. 773, 98 N.E.2d 893; Ward v. Ward, 197 Okla. 551, 172 P.2d 978.
We have not commented on the testimony of the plaintiff. Her testimony could not remedy the deficiencies in proof, because under the "Dead Man's Statute" she was precluded from giving her version of the transaction.
The evidence was insufficient to meet the test imposed by the law for proof of the alleged contract. Having reached that conclusion, it is unnecessary to pass on questions raised relating to proof of services performed.
Appellant argued that the trial court, in refusing to permit the case to go to the jury, invaded the province of the jury by judging the evidence. The rule that the jury is the trier of the facts and is the judge of the credibility and weight of the evidence, must be considered together with the rule that it is the duty of the trial court to direct a verdict for the defendant if the evidence submitted falls short of that minimum upon which the jury could lawfully find a verdict for plaintiff. Swilley v. Economy Cab Co. of Jacksonville, Fla. 1951, 56 So.2d 914. In order to comply with the latter rule, the trial court must place its own evaluation upon the evidence to determine the question of its minimum sufficiency.
*171 The action of the trial court in granting the defendant's motion for directed verdict has not been shown to be error, and the judgment entered thereon is affirmed.
Affirmed.
HORTON and PEARSON, JJ., concur.